Filed 10/3/13     Opinion following rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| GETFUGU, INC., et al., | B231794 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC444530) |
| v. | |
| PATTON BOGGS LLP, et al., | |
| Defendants and Respondents. | |


APPEAL from an order of the Superior Court of Los Angeles County, David L. Minning, Judge.  Reversed in part and affirmed in part.

Luce, Forward, Hamilton & Scripps, McKenna Long & Aldridge, Charles A. Bird and Theona Zhordania for Plaintiffs and Appellants.

Robie & Matthai, Edith R. Matthai, Kyle Kveton and Natalie A. Kouyoumdjian for Defendants and Respondents.

———————————

Plaintiffs and appellants GetFugu, Inc. (GetFugu), Carl Freer (Freer) and Richard Jenkins (Jenkins) (collectively, Plaintiffs) appeal an order granting a special motion to strike (Code Civ. Proc., § 425.16) filed by defendants and respondents Patton Boggs LLP (Patton), Richard J. Oparil (Oparil), Cummins and White LLP (Cummins) and Iman Reza (Reza) (collectively, the Attorney Defendants).[1][2]

The issues presented include whether the Attorney Defendants met their burden to show Plaintiffs' defamation claim arose from protected activity by the Attorney Defendants, and whether Plaintiffs, in resisting the special motion to strike, demonstrated their defamation claim had the requisite minimal merit to withstand the defense motion.

For the reasons discussed below, the order is partially reversed with respect to the cause of action for defamation by GetFugu and Freer against two of the Attorney Defendants, Patton and Oparil, and is otherwise affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The earlier RICO action.*

In January 2010, Davies and Warnock filed a civil action under the federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) on behalf of themselves as well as GetFugu shareholders, alleging claims arising from RICO violations, breaches of fiduciary duty, fraud, breach of contract and conspiracy. Davies and Warnock were represented by Oparil, of the Patton firm, and Reza, of the Cummins firm.

The district court dismissed the state law claims in that action without prejudice, ruling it would not exercise supplemental jurisdiction to hear them. Davies and Warnock appealed the district court's order. They also filed a state court action pursuing the

---

[1]    An order granting a special motion to strike is appealable. (Code Civ. Proc., § 425.16, subd. (i), § 904.1, subd. (a)(13).)
    All further statutory references are to the Code of Civil Procedure, unless otherwise specified.
[2]    During the pendency of the appeal, GetFugu, a suspended corporation, obtained a certificate of revivor, enabling the appeal to be resolved on the merits.

2

claims that were dismissed by the district court without prejudice. Thus, at the time of the instant lawsuit against the Attorney Defendants, the claims made by Davies and Warnock against GetFugu, Freer and Jenkins were ongoing.[3]

2. *Oparil's two written statements which are the basis of the defamation claim.*

Despite the voluminous record, at this juncture Plaintiffs/appellants are basing their defamation claim on only two items: a one-page press release by Oparil, dated March 22, 2010, and a three-line "Tweet" by Oparil, dated August 31, 2010. [4]

a. *The March 22, 2010 press release*

On March 22, 2010, Oparil issued a press release captioned "FBI SAID TO BE INVESTIGATING GETFUGU'S CARL FREER." This press release, which is the main basis of the instant defamation action, stated in pertinent part:

"David Warnock and Simon Davies, the plaintiffs in the civil RICO case against Carl Freer and others involving GetFugu, Inc., said they were pleased about a report by the Copenhagen Post that the FBI and Danish authorities are investigating Freer's involvement in the Danish IT Factory scandal. The FBI's criminal investigation is separate from the civil suit.

"According to the article, the FBI is following what is said to be a complex international money trail that allegedly links GetFugu and Freer to several failed 'pump and dump' investments, including the now defunct IT Factory. Warnock and Davies' RICO First Amended Complaint alleges that the Securities and Exchange Commission is already investigating GetFugu. According to a November 2, 2009, SEC filing, in October 2005, Mr. Freer was sentenced to probation and fined by a court in Germany for buying four luxury cars with a bad check.[5]

---

[3]    Plaintiffs subsequently settled with Davies and Warnock.
[4]    A Tweet is a brief message on a social networking website.
[5]    The record reflects that in an SEC filing, GetFugu reported that Freer, one of its directors, was sentenced in October 2005 "to probation and fined by a court in Germany, for buying four luxury cars with a bad check, [al]though Mr. Freer contended he had canceled the check after believing the cars did not have proper title and immediately

3

"On March 26th, Mikael Ljungman a co-defendant in the civil RICO action and Freer's partner, was convicted on all nine counts in a Denmark-based fraud case. Prosecutors made their case that money was channeled through over a dozen 'secret' companies that Ljungman established in tax havens around the world. The trial also produced evidence that Ljungman was laundering invested funds through the Los Angeles-based GetFugu, which is controlled by Swedish national Freer.

"Warnock said that 'information from credible sources is streaming in from several countries. That added to the large number of documents and communications that we already have gathered will be used to support our original civil RICO action and new information [we] are currently gathering could be used to expand the scope of that case or spawn several independent legal actions in the coming weeks.' Warnock and Davies indicated that they would cooperate with any inquiry by the FBI or Danish investigators. Counsel for plaintiffs in the RICO case is Richard J. Oparil of Patton Boggs LLP in Washington.

"Investigative leads may be sent to CivilRICOtipline@hushmail.com. All tips will be held in the strictest of confidence."

   b. *The August 31, 2010 "Tweet" by Oparil.*

On August 31, 2010, Oparil issued the following Tweet on his Twitlonger account:

"GetFugu runs an organization for the benefit of its officers and directors, not shareholders and employees. The RICO suit was not frivolous. The 500K lawsuit is frivolous, however, so buyer be wary."

  3. *The instant lawsuit against the Attorney Defendants.*

   a. *Pleadings.*

On August 26, 2010, the same day the district court dismissed the RICO complaint, Plaintiffs GetFugu and Freer filed the instant action.

---

informed the authorities." Thus, the fact of Freer's criminal conviction in Germany is undisputed.

On September 20, 2010, Plaintiffs filed their operative first amended complaint. The pleading consisted of two unlabeled causes of action, captioned as "First Cause of Action" and "Second Cause of Action."[6] As the trial court noted, it appears the operative complaint purported to set forth claims against the Attorney Defendants for malicious prosecution and defamation as well as declaratory relief.[7][8]

       b. *Special motion to strike*.

On November 22, 2010, the Attorney Defendants filed a special motion to strike the first amended complaint. The moving papers asserted the complaint was subject to a special motion to strike because it was based upon petitioning activity and statements made by Oparil in anticipation of, or in connection with, an issue pending before an official proceeding. Further, because the anti-SLAPP statute was implicated, the burden shifted to Plaintiffs to demonstrate a probability of prevailing on their claims against the Attorney Defendants.

The Attorney Defendants contended Plaintiffs could not prevail because the alleged statements and writings were shielded by the litigation privilege. (Civ. Code, § 47, subd. (b).) The various statements or writings concerned the pending federal litigation and the SEC and FBI investigations, and were indisputably statements or

---

[6]    Rule 2.112 of the California Rules of Court requires each separately stated cause of action to specify "[i]ts nature (e.g., 'for fraud.')"

[7]    Plaintiffs' cause of action against the Attorney Defendants for malicious prosecution is not in issue on appeal. In granting the special motion to strike in its entirety, the trial court noted Plaintiffs' concession that "there has not yet been a 'favorable termination' of the underlying action . . . ." Plaintiffs have limited their appeal to the viability of their defamation claim against the Attorney Defendants based on (1) the March 22, 2010 press release; and (2) the August 31, 2010 Tweet.

[8]    Plaintiffs contend they alleged "a civil conspiracy of Davies, Warnock and [the Attorney Defendants] to destroy GetFugu and [P]laintiffs' ability to raise capital, by unlawful means, including defamation." However, Plaintiffs' first amended complaint is vague in its allegations and does not purport to set forth a cause of action for civil conspiracy. Moreover, before an attorney can be sued for civil conspiracy with his or her client, the plaintiff must seek leave of court to allege such a cause of action. (Civ. Code, § 1714.10, subd. (a).) That did not occur here.

5

writings made in the course of a matter pending before an official proceeding authorized by law, and therefore were absolutely privileged under Civil Code section 47, subdivision (b).

The moving papers further argued that even if the defamation claim against the Attorney Defendants were not barred by the litigation privilege, Plaintiffs could not prevail because the statements in issue were either truthful or consisted of non-actionable opinion.

c. *Plaintiffs' opposition to the special motion to strike.*

Plaintiffs contended the litigation privilege did not shield the press release or the Tweet, because those publications to nonparticipants had no functional connection to the litigation.

Plaintiffs also disputed the Attorney Defendants' contention that the statements were true or were nonactionable opinion. In opposing the special motion to strike, Plaintiffs submitted numerous declarations and contended they demonstrated a prima facie case of defamation.[9]

Freer's opposing declaration stated in pertinent part: "Neither I nor Getfugu are, nor have we ever been, under investigation by the FBI, the SEC, or any other government agency."

The opposing declaration of John C. Kirkland stated: "As counsel for GetFugu, I have repeatedly spoken with the staff at SEC regarding the company. After accusations were made that the SEC was investigating GetFugu or Carl Freer, I telephoned the SEC and asked if this were the case. I was assured that it was not. I was also assured that, as company counsel, I would be promptly advised if there were any such investigation. I have never been so advised."

---

[9]     In discussing the evidentiary showing made in the opposing declarations, we omit the portions to which evidentiary objections were sustained.

6

Kirkland further stated, with respect to the statement in Oparil's press release that Davies and Warnock "were pleased about a report by the Copenhagen Post that the FBI and Danish authorities are investigating Freer's involvement in the Danish IT Factory scandal," as follows: "In March of 2010, an article appeared in Copenhagen Post entitled 'FBI Enters Stein Bagger Case,' making false accusations about Mr. Freer and GetFugu. I sent a letter to [the] paper explaining the defamatory nature of the article, a copy of my letter is attached hereto as Exhibit 3. The Copenhagen Post thereafter removed the article from the Internet."

Further, the declaration of Jenkins, a founder of GetFugu and its CEO, stated the Oparil press release "that GetFugu is being investigated by the FBI and the SEC, that Mikael Ljungman, a convicted felon, was laundering invested funds through GetFugu and that GetFugu and its officers and directors are involved in racketeering activities" was false.

### d. *Trial court's ruling.*

On January 20, 2011, the matter came on for hearing. After taking the matter under submission, the trial court granted the Attorney Defendants' special motion to strike, with respect to both the malicious prosecution claim and the claim for defamation. With respect to the defamation claim, the trial court ruled as follows:

"Defendants have demonstrated that the acts complained of by plaintiffs in their 1st Amended Complaint were taken in furtherance of defendants' right of petition or free speech under the [United States] or [California] Constitutions. (CCP 425.16(b)(l).) Additionally, statements made before or in connection [with] an issue pending before an official proceeding pursuant to CCP 425.16(e)(2) are subject to the anti-SLAPP statute and there is no further requirement that the statements concern an issue of public significance. [Citation.] However, "investment scams" are considered to be matters of public interest. As such, defendants could establish the "public interest" element of CCP 425.16(e)(3) & (4).

7

"Plaintiffs have been unable to demonstrate a probability of prevailing in the matter. The litigation privilege applies so long as the communication has "some relation" to the judicial proceedings. Here the alleged statements have some relation to the RICO action and are therefore subject to the privilege. [Citation.] Doubts as to whether the privilege applies are resolved in favor of its application. [Citation.] Further, the documents directly attributable to the moving defendants (plaintiffs' exhibit I & L) [the press release and the Tweet] are not defamatory but accurate notifications of RICO claims and a restatement of the allegations in general form."

Plaintiffs filed a timely notice of appeal from the order granting the special motion to strike.[10]

### CONTENTIONS

Plaintiffs contend: they established a probability they would prevail on their defamation claims based on the Oparil press release and the Tweet; and the trial court abused its discretion is sustaining the Attorney Defendants' evidentiary objections to the declaration of Chris Sturm.

### DISCUSSION

1. *General principles; standard of appellate review.*

A special motion to strike "involves a two-step process. First, the defendant must make a prima facie showing that the plaintiff's 'cause of action . . . aris[es] from' an act by the defendant 'in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue.' [Fn. omitted.] (§ 425.16, subd. (b)(1).) If a defendant meets this threshold showing, the cause of action shall be stricken unless the plaintiff can establish 'a probability that the plaintiff will prevail on the claim.' " (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 (*Simpson*), fn. omitted.)

---

[10]     On July 6, 2011, during the pendency of this appeal, the trial court denied Plaintiffs' motion for reconsideration of the order granting the special motion to strike.

In other words, to defeat a special motion to strike, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88-89.)

Review "of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

2. *Order granting special motion to strike must be affirmed as to Reza and Cummins.*

In seeking to overturn the trial court's ruling with respect to the defamation claim, the Plaintiffs/appellants have limited their arguments to two publications – the March 22 press release by Oparil of the Patton firm, and Oparil's subsequent Tweet.

As pointed out in the respondents' brief, none of the statements on which Plaintiffs rely is attributed to Reza or the Cummins firm. Therefore, the order granting the special motion to strike is summarily affirmed in favor of Reza and Cummins.

3. *Order granting special motion to strike must be reversed as to Oparil and the Patton firm; Plaintiffs GetFugu and Freer met their burden to show their defamation claim against said defendants has minimal merit.*

a. *First prong; Attorney Defendants met their burden to show Plaintiffs' defamation claim arose from protected activity by the Attorney Defendants.*

As used in section 425.16, " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;

9

(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) *any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest,* or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e), italics added.)

As the trial court found, investment scams are a matter of public interest. Investors turn to the markets to help secure their futures, pay for homes, and send children to college, making investor protection more compelling than ever. (http://www.sec.gov/about/whatwedo.shtml (last visited Sept. 30, 2013).) "And the common interest of all Americans in a growing economy that produces jobs, improves our standard of living, and protects the value of our savings" means there is a public interest in protecting investors so as to promote the capital formation that is necessary to sustain economic growth. (*Ibid.*)

Obviously, not every act of fraud is a matter of public interest. Here, however, the alleged investment scam concerned Getfugu, a public company whose common stock was traded on the OTCBB.

Therefore, the Attorney Defendants met their threshold burden to show the defamation claim arose out of their protected activity, so as to implicate the anti-SLAPP statute. The burden then shifted to Plaintiffs to establish they were capable of prevailing on their claim. (*Simpson, supra,* 49 Cal.4th at p. 21.)

10

b. *Second prong; Plaintiffs GetFugu and Freer met their burden to show their defamation claim, arising out of the Oparil press release, had the requisite minimal merit.*[11]

(1) *The press release and Tweet are not shielded by the litigation privilege.*

The press release, which is the essence of this case, asserted the FBI was conducting a criminal investigation of GetFugu's Freer, independent of the civil RICO suit.

The usual formulation of the litigation privilege is that it "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 (*Silberg*).) The principal purpose of the litigation privilege "is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Id.* at p. 213.) The litigation privilege "promotes the effectiveness of judicial proceedings by encouraging 'open channels of communication and the presentation of evidence' in judicial proceedings." (*Ibid.*) However, "*republications to nonparticipants* in the action are generally not privileged under [the litigation privilege], and are thus actionable unless privileged on some other basis." (*Id.* at p. 219, italics added; accord *Susan A. v. County of Sonoma* (1991) 2 Cal.App.4th 88, 93 [litigation privilege "does not apply where publication is to persons in no way connected with the proceeding"].)

For example, in *Susan A.*, a psychologist interviewed a 14-year-old boy who was accused of attempted murder, and thereafter made statements about the boy to the press. The boy's parents sued. (*Susan A., supra*, 2 Cal.App.4th at pp. 92-93.) *Susan A.* held the

---

[11] The March 22, 2010 press release by Oparil did not mention Jenkins. Therefore, Jenkins failed to meet his burden to show his defamation claim had minimal merit.

11

challenged statements to the news media were not covered by the litigation privilege. (*Id.* at pp. 93-96.)

We are mindful case law has "expanded the scope of [the litigation privilege] to include publication to nonparties with a substantial interest in the proceeding (see *Costa v. Superior Court* (1984) 157 Cal.App.3d 673, 678) . . . ." (*Susan A., supra*, 2 Cal.App.4th at p. 94.) For example, in *Costa*, the chairman of the board of directors of a fraternal lodge organization sent a letter to lodge members in which he explained the basis of then pending litigation, and solicited the support and views of the members relating to the issues in dispute. (*Costa, supra*, 157 Cal.App.3d at p. 676.) *Costa* held the "lodge members to whom the letter was addressed possessed a substantial interest in the outcome of the pending litigation and as such were authorized participants therein." (*Id.* at p. 678.)

Guided by *Costa*, the court in *Abraham v. Lancaster Community Hospital* (1990) 217 Cal.App.3d 796 (*Abraham*), held the alleged communication of monopoly and antitrust allegations against a hospital administrator "within the Antelope Valley and specifically within the medical community [were] privileged communications. . . . . [T]he local medical community possessed 'a substantial interest in the outcome of the pending litigation' and as such were 'participants' therein. (*Costa v. Superior Court, supra*, 157 Cal.App.3d at p. 678.)" (*Abraham, supra,* at p. 823.)

Notwithstanding the expansion of the scope of the litigation privilege to extend to publication to nonparties with a substantial interest in the proceeding, "the expansion does not encompass publication to the general public through the press. Such an expansion would swallow up the general rule, which our Supreme Court . . . reaffirmed, that [the litigation privilege] does not privilege 'republications to nonparticipants in the action . . . .' ( *Silberg v. Anderson, supra,* 50 Cal.3d at p. 219.)" (*Susan A., supra,* 2 Cal.App.4th at p. 94.)

This court reiterated that principle in *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134 (*Rothman*). In *Rothman,* an attorney sued a celebrity and the celebrity's attorney and investigator, following a press conference in which they asserted the attorney and his

12

clients had made false accusations against the celebrity in order to extort money from him. (*Id*. at p. 1139.) The trial court sustained the defendants' demurrer as to all causes of action on the ground of the litigation privilege. (*Id*. at p. 1138.)

This court reversed, ruling the "challenged statements were made by the defendants in a press conference, and not in any context which the litigation privilege exists to protect." (*Rothman, supra*, 49 Cal.App.4th at p. 1138.) We further held "the litigation privilege should not be extended to 'litigating in the press.' Such an extension would not serve the purposes of the privilege; indeed, it would serve no purpose but to provide immunity to those who would inflict upon our system of justice the damage which litigating in the press generally causes: poisoning of jury pools and bringing disrepute upon both the judiciary and the bar." (*Id.* at p. 1149.)

In the instant case, Oparil issued a press release and a Tweet to publicize the alleged misdeeds of GetFugu and Freer. The Attorney Defendants contend the press release was issued through "Investor Wire" and was directed to persons in the investment community, so as to be shielded by the litigation privilege. The argument is unpersuasive. The press release and Tweet were posted on the Internet and thus were released worldwide. Dissemination of these publications to a segment of the population as large as the "investment community" is essentially the same as disclosure to the general public. If anyone with an interest in the outcome of the litigation is a person to whom a privileged communication could be made, *Silberg* and *Rothman* would be eviscerated. We conclude the March 22, 2010 press release and the August 31, 2010 Tweet are not shielded by the litigation privilege.

(2) *The evidence is in conflict as to whether the gist of the press release is true; Plaintiffs GetFugu and Freer met their minimal burden in that regard.*

The Attorney Defendants contend that assuming arguendo the press release is not shielded by the litigation privilege, the defamation claim is meritless because the statements in the press release are true.

13

The gist of the press release is that the FBI was conducting a *criminal investigation* of GetFugu's Freer, independent of the civil RICO suit ["The FBI's criminal investigation is separate from the civil suit"].

As in "other jurisdictions, California law permits the defense of substantial truth and would absolve a defendant even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details.' " *(Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 516-517.)  "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' " (*Id*. at p. 517.)

Although the Attorney Defendants assert the press release is true, the evidence is in conflict as to the existence of a criminal investigation by the FBI.  As set forth above, the declarations filed in opposition to the special motion to strike disputed that either the FBI or the SEC were investigating Freer or GetFugu.

Specifically, Freer's opposing declaration stated in pertinent part:  "Neither I nor GetFugu are, nor have we ever been, under investigation by the FBI, the SEC, or any other government agency."

Similarly, the declaration of Jenkins, a founder of GetFugu and its CEO, stated the Oparil press release "that GetFugu is being investigated by the FBI and the SEC, that Mikael Ljungman, a convicted felon, was laundering invested funds through GetFugu and that GetFugu and its officers and directors are involved in racketeering activities" was false.

Further, the declaration of Attorney Kirkland stated he had advised the Cophenhagen Post that the newspaper article referring to an FBI investigation of Freer was false, and in response the newspaper removed the article from the Internet.

In determining whether a plaintiff has made the required showing in opposition to a special motion to strike, " '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence.  Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.' " (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989.)  Thus, in

14

order to defeat a special motion to strike, a plaintiff need only present sufficient evidence showing "a case of 'minimal merit.' " (*Ibid.*) The opposing declarations, by disputing the existence of an *FBI criminal investigation of Freer*, were sufficient to meet that slight threshold, so as to enable GetFugu and Freer to proceed on the defamation claim.[12]

    (3) *The Tweet was merely nonactionable opinion.*

Unlike the press release, the Tweet is not actionable at all.

" 'The sine qua non of recovery for defamation . . . is the existence of falsehood.' [Citation.] Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected. [Citation.]" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).) That does not mean that statements of opinion enjoy blanket protection. (*Ibid*.) To the contrary, where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation. (*Milkovich v. Lorain Journal Co*. (1990) 497 U.S. 1, 18-19.) The critical question is not whether a statement is fact or opinion, but " 'whether a reasonable fact finder could conclude

---

[12]    We note that not all portions of the press release are actionable. The press release stated in pertinent part: "According to a November 2, 2009, SEC filing, in October 2005, Mr. Freer was sentenced to probation and fined by a court in Germany for buying four luxury cars with a bad check." The record includes a copy of an SEC filing by GetFugu wherein it reported that Freer, one of its directors, was sentenced in October 2005 "to probation and fined by a court in Germany, for buying four luxury cars with a bad check, [al]though Mr. Freer contended he had canceled the check after believing the cars did not have proper title and immediately informed the authorities." Thus, the fact of Freer's criminal conviction in Germany is undisputed.
    The press release also states: "Warnock and Davies' RICO First Amended Complaint alleges that the Securities and Exchange Commission is already investigating GetFugu." This statement in the press release is consistent with paragraph 186 of the first amended RICO complaint, and therefore is protected as a fair and true report of the contents of the pleadings. (Civ. Code, § 47, subd. (d)(1); *Abraham, supra,* 217 Cal.App.3d at p. 823.)

15

the published statement declares or implies a provably false assertion of fact.' "
(*McGarry, supra,* 154 Cal.App.4th at p. 113.)

To ascertain whether the statements in question are provably false factual assertions, courts consider the totality of the circumstances. (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1049 (*Nygard*).) Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. (*Ibid.*)

For example, in *Nygard*, statements by a defendant/former employee that he "slaved . . . without a break," that the plaintiff/employer wanted the employee to work "round the clock" and that the employer "[a]pparently . . . hasn't heard about working hours" (*Nygard, supra,* 159 Cal.App.4th at p. 1047), amounted to nonactionable statements of opinion, rather than verifiable statements of fact. "No reasonable reader could understand the description of [the employee's] work experience with plaintiffs as ' "horrible" ' and a ' "horror" ' to mean that [the employee] was literally struck with horror while working for the company. Instead, ' "horrible" ' and a ' "horror" ' colorfully convey [the employee's] subjective belief that working for the company was unpleasant. His subjective reaction does not contain 'provable facts,' and no reasonable reader could understand these words as statements of actual working conditions. [The employee's] statements that ' "I was used!" ' and ' "I Felt Myself Used!" ' also connote his subjective judgment that working for the company was unpleasant." (*Id*. at p. 1052.)

Here, the Tweet by Oparil, in its entirety, stated as follows: "GetFugu runs an organization for the benefit of its officers and directors, not shareholders and employees. The RICO suit was not frivolous. The 500K lawsuit is frivolous, however, so buyer be wary."

Deprecatory statements regarding the merits of litigation are "nothing more than 'the predictable opinion' of one side to the lawsuit" and cannot be the basis for a defamation claim. (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1403.)

16

Further, insofar as the Tweet asserted "GetFugu runs an organization for the benefit of its officers and directors, not shareholders and employees," Oparil was stating his subjective opinion with respect to corporate governance at GetFugu. Accordingly, the Tweet is not actionable.

4. *Respondents' motion for judicial notice on appeal*.

The Attorney Defendants seek judicial notice of a September 24, 2009 letter from a staff attorney at the SEC to one David Patch, stating "the enforcement staff of the U.S. Securities and Exchange Commission ('SEC') is conducting an inquiry in the above-referenced matter [*In the Matter of GetFugu, Inc. (MSF-3500)*] to determine whether there have been violations of the federal securities laws." The motion contends the document is subject to judicial notice as an official act of an executive agency of the United States. (Evid. Code, § 452, subd. (c).)

The Attorney Defendants fail to show good cause why this letter was not presented in the court below. The movants contend the letter was not submitted previously because GetFugu "did not make the argument that there was no SEC investigation until its motion for reconsideration." The record is to the contrary. As set forth above, the opposing declarations of Kirkland and others, filed in opposition to the special motion to strike, denied the existence of an SEC investigation. The existence of an SEC investigation was disputed by Plaintiffs from the inception.

In any event, the SEC letter is unavailing to the Attorney Defendants at this juncture. The SEC letter has no bearing on whether the FBI was conducting a criminal investigation of GetFugu's Freer. Further, all the letter does is reiterate there is conflicting evidence with respect to whether the SEC was investigating GetFugu. However, the Attorney Defendants cannot rely on conflicting evidence to obtain early dismissal by way of a special motion to strike. (*Grewal v. Jammu, supra,* 191 Cal.App.4th at p. 989.)

17

5. *Remaining issues not reached.*

In view of our determination that the order granting the special motion to strike must be reversed as to Oparil and the Patton firm, it is unnecessary to address Plaintiffs' contention the trial court erred in sustaining evidentiary objections to the Sturm declaration.

## DISPOSITION

The order granting the special motion to strike is reversed solely with respect to the cause of action by GetFugu and Freer against Oparil and Patton for defamation based on the March 22, 2010 press release, in accordance with the principles set forth herein; in all other respects the order is affirmed. Respondents' motion for judicial notice is denied. Costs are awarded solely to Reza and Cummins.

**CERTIFIED FOR PUBLICATION**


KLEIN, P. J.

We concur:


CROSKEY, J.


KITCHING, J.

18